UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | Criminal No. 3:17cr173 (JBA) |
| v. | |
| CARL HUBBARD | November 12, 2021 |

**RULING DENYING DEFENDANT'S MOTION FOR SENTENCE MODIFICATION**

Defendant Carl Hubbard moves to modify his sentence under 18 U.S.C. § 3582(c)(1)(A) on the grounds that his medical conditions, along with the COVID-19 pandemic, constitute extraordinary and compelling reasons warranting modification of his sentence to home confinement. (Mem. of Law in Supp. of Mot. to Modify Sentence ("Def.'s Mem.") [Doc. # 171] at 15.) The Government opposes. (Gov't's Resp. to Def.'s Mot. to Modify Sentencen [sic] ("Gov't's Resp.") [Doc. # 176] at 1.) A hybrid hearing was held on November 2, 2021. (*See* Min. Entry [Doc. # 192].) For the reasons that follow, Defendant's motion is DENIED.

**I. Background**

Defendant Carl Hubbard was convicted by his guilty plea to one count of conspiracy to possess with intent to distribute five hundred grams or more of a mixture containing a detectable amount of cocaine and a quantity of marijuana, in violation of 21 U.S.C. §§ 846, 841(b)(l)(B)(ii), and 841(b)(l)(D), and was sentenced to seventy-seven months imprisonment followed by four years of supervised release. (Gov't's Resp. at 4-5.) Mr. Hubbard is currently held at Beckley FCI and is scheduled to be released from Bureau of Prisons ("BOP") custody March 9, 2023. (Gov't's Suppl. Resp. [Doc. # 187] at 1.) As of November 10, 2021, 190 inmates had tested positive for COVID-19 at Beckley FCI, none of which are active infections. *COVID-19*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last accessed Nov. 10, 2021). One staff member has an active COVID-19

1

infection, out of a total of 100 infections among the staff. No deaths have been reported at the facility. *Id. COVID-19*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus (last accessed Nov. 10, 2021). COVID-19 vaccinations have been offered to all persons at Beckley FCI, including Defendant.[1]

The Court assumes the parties' familiarity with the ongoing COVID-19 pandemic and its spread from person-to-person, especially between those who are in close contact with one another. *How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last accessed Nov. 10, 2021). The Centers for Disease Control and Prevention ("CDC") represents that, being obese, defined as a body mass index of over 30 kg/m$^2$ but less than 40 kg/m$^2$, "can make you more likely to get severely ill from COVID-19."[2] *People with Certain Medical Conditions,* CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Nov. 10, 2021). Having hypertension "possibly . . . can make you more likely to get severely ill from COVID-19." *Id.*

---

[1] *See Oversight of the Federal Bureau of Prisons: Hearing before the S. Comm. on the Judiciary* (2021) (statement by Michael D. Carvajal) (stating that all incarcerated persons would have the opportunity to receive the vaccine by mid-May 2021).

[2] At the time of filing, Defendant and the Government stated that obese individuals "are at" an increased risk and individuals with hypertension "might be" at an increased risk. (Def.'s Mem. at 8; Gov't's Resp. at 8. (citing *People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html).) The CDC has since updated this information, stating that obesity "can make [it] more likely" that an individual will become severely ill if she contracts COVID-19 and hypertension "possibly . . . can make [it] more likely" that an individual could become severely ill from COVID-19. *See People with Certain Medical Conditions,* CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Nov. 10, 2021); *see also United States v. Jaramillo*, No. 20-3240, 2021 WL 2224370, at *2 (2d Cir. June 2, 2021).

Defendant is "obese and suffers from hypertension," which are the bases for his motion. (Def. Hubbard's Reply Mem. in Further Support of his Mot. to Modify Sentence ("Def.'s Reply") [Doc. # 180] at 1.) He also has hyperlipidemia (high cholesterol), (Def.'s Mem. at 8), and the Government notes that Defendant's medical records indicate that he "may be at risk for diabetes based on his BMI and hypertension, as well as family history," (Gov't's Resp. at 9 n.1).

Mr. Hubbard declined to receive the Pfizer COVID-19 vaccine on January 21, 2021. (Ex. 1, COVID-19 Vaccine Consent Form, Gov't's Resp. [Doc. #176-1].) Again, on April 6, 2021, FCI Beckley offered vaccinations but Mr. Hubbard did not receive the COVID-19 vaccine. (Ex. 1, COVID-19 Vaccine Consent Form, Gov't's Suppl. Resp. [Doc. # 187-1].) Defendant states that he did not consent to receive the vaccine in January because "no information was given to him about the vaccine and he was legitimately concerned about the way the vaccine would have been administered." (Def.'s Reply at 2.) At the hearing, he stated that in January, he never received the Emergency Use Authorization fact sheet, explaining the risks and benefits of vaccination, which was referenced on FCI Beckley's vaccination consent form. He stated his refusal was also based on concern that medical personnel would not monitor him for fifteen to thirty minutes after vaccination instead of sending him directly back to his cell. Regarding the April 2021 vaccine, Mr. Hubbard explained that a correctional officer announced that individuals willing to receive the vaccine would receive extra commissary, but Mr. Hubbard was unsure that he was eligible because he had previously declined the vaccine, so he did not try to get vaccinated at this time. Mr. Hubbard's April 2021 COVID-19 vaccination consent form reflects that he "refused to sign." (Ex. 1, COVID-19 Vaccine Consent Form, Gov't's Suppl. Resp. [Doc. # 187-1].) Mr. Hubbard explained, however, that he did not physically walk down to the health unit to decline this vaccination.

As proof of Beckley FCI's vaccine mismanagement, Mr. Hubbard referenced his experience declining the vaccine in January 2021. He stated that when he was called to

receive the jab with his unit, he asked if the doctor would sit with him for fifteen to thirty minutes after he was vaccinated, and this request was declined. Mr. Hubbard represents that individuals were not being monitored after their vaccinations and everyone from his unit—whether they received the shot or not—returned back to the unit at the same time, without any health monitoring. At the hearing, however, the Government read into the record a note from the assistant health administrator of FCI Beckley reporting that Mr. Hubbard was given time to ask questions about the vaccine and that all individuals receiving the vaccine were kept for thirty minutes in health services for observation.

Mr. Hubbard confirmed that he never sought out any information on the vaccine from FCI Beckley, particularly about the potential of serious allergic reactions, and never took any affirmative steps to receive the vaccination.[3] He also reported that he does not have any known allergy that would increase his risk of an adverse reaction or anaphylaxis. Mr. Hubbard indicated that if released, he would be willing to receive the COVID-19 vaccination after receiving a physical and allergy tests to ensure that he would not have a reaction to the vaccine.

Defendant submitted his request for compassionate release to the Warden at FCI Beckley who denied it on June 11, 2020. (*See* Ex. D, Mem. in Supp. [Doc. 171-1].) After exhausting his administrative remedies within the BOP, Mr. Hubbard moved to modify his sentence on February 17, 2021. (Mot. to Modify Sentence [Doc. #170] at 1.)

## II. Discussion

### A. Legal Standard

Defendant moves for release under 18 U.S.C. § 3582(c)(1)(A), which provides that:

> the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons

---

[3] He stated that he once asked a nurse for an Emergency Use Authorization fact sheet, but the nurse responded that the fact sheet was propaganda. It is not clear from the record when Mr. Hubbard requested this fact sheet, but he later stated that after January 2021, the only information he sought out about the vaccine was from his mother.

> to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Although incarcerated persons previously could only seek compassionate release from the BOP, the First Step Act of 2018 permits federal prisoners to seek relief from the federal courts upon exhaustion of administrative rights. *See* 18 U.S.C. § 3582(c)(1)(A). In "shift[ing] discretion from the [BOP] to the courts," the First Step Act brought about monumental change in an incremental way, paving the way for "the release of thousands of imprisoned people who[] did not need to be incarcerated" by "giving discretion to an appropriate decisionmaker," instead of "mandating more lenient outcomes." *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020). By empowering district courts to reduce sentences and release prisoners, Congress intended to expand, expedite, and improve the process of compassionate release. *Id.* at 235. While a district court's discretion to grant compassionate release motions is extensive, a court cannot find extraordinary and compelling circumstances based on "rehabilitation *alone.*" *Brooker*, 976 F.3d at 237-38.

### B. Extraordinary and Compelling Reasons

Defendant argues that his obesity and hypertension, along with the COVID-19 pandemic, constitute extraordinary and compelling reasons warranting modification of his sentence to home confinement. He supports his argument with cases decided before vaccines were readily available to persons incarcerated within the BOP's facilities and involved no analysis of the relationship between extraordinary and compelling circumstances and

availability of the COVID-19 vaccination to incarcerated persons.[4] (Def.'s Mem. at 8-9 (citing *inter alia United States v. Pena*, 3:17-cr-00150 (VAB), 2021 WL 486573 (D. Conn. Feb. 9, 2021) (finding that defendant's obesity and hypertension, in conjunction with the COVID-19 pandemic, constituted extraordinary and compelling circumstances); *United States v. De La Cruz*, No. 3:17-cr-150 (VAB), 2020 WL 6193891 (D. Conn. Oct. 22, 2020) (concluding that in the context of the COVID-19 pandemic, defendant's obesity and hypertension constituted extraordinary and compelling circumstances and noting that COVID-19 cases were rising at defendant's facility).

The Court recognizes that being offered and refusing the COVID-19 vaccine is not an "automatic, disqualifying factor" for compassionate release, but refusing the vaccine without informed reason substantially detracts from an incarcerated person's claim of exceptional medical vulnerability in prison.[5] It is also a factor of significant weight, in light of the continuing scientific research results on vaccine efficacy showing that the Pfizer vaccine is effective in reducing risk and severe consequences of COVID-19 infection in most people.[6] When an incarcerated individual has refused the COVID-19 vaccine, courts "have nearly uniformly denied compassionate release sought for medical reasons." *United States v. Robinson*, No. 17 Cr. 611-7 (AT), 2021 WL 1565663, at *3 (S.D.N.Y. Apr. 21, 2021) (collecting

---

[4] By the end of February 2021, doses of the vaccine had been distributed to "every location within the Bureau." *COVID-19 Vaccination Status*, FED. BUREAU PRISONS, https://www.bop.gov/resources/news/20210223_vaccination_status.jsp (last accessed Nov. 10, 2021). However, the Director of the BOP testified before the Senate Judiciary Committee that it would not be until mid-May 2021 that all incarcerated persons would have the opportunity to be vaccinated. *Oversight of the Federal Bureau of Prisons: Hearing before the S. Comm. On the Judiciary* (2021) (statement by Michael D. Carvajal).

[5] *See, e.g.*, *United States v. Lum*, No. 18cr00073, 2021 WL 358373, at 5 n.19 (D. Haw. Feb. 2, 2021). Some of the considerations in *Lum* are no longer relevant given the FDA's permanent approval of the Pfizer-BioNTech COVID-19 Vaccine. *See FDA Approves COVID-19 Vaccine*, FOOD & DRUG ADMIN., https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (last accessed Nov. 10, 2021).

[6] *See Pfizer-BioNTech*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html (last accessed Nov. 10, 2021).

6

cases); *see also United States v. Poupart*, 3:11cr116 (JBA), 2021 WL 917607, at *1 (D. Conn. March 10, 2021) ("Evidence that a defendant has been offered the vaccine, whether he accepts it or not, demonstrates that he had the ability and opportunity to take measures to markedly reduce his risk of severe illness or death from COVID-19 while incarcerated.").

This outcome results even when a defendant bases refusal on distrust in the prison administration.[7] *See United States v. Colon*, 6:18-CR-06040(EAW), 2021 WL 1246187 (W.D.N.Y. Apr. 5, 2021). In *Colon*, the defendant voiced concern over the ability of prison staff to address any allergic reaction that he might have to the vaccine. 2021 WL 1246187, at *2. The court acknowledged the potential risks in vaccination but concluded that "even accepting Defendant's arguments about the ability of the staff to take appropriate precautions in the event Defendant experiences an adverse reaction, any such risks seem to be significantly outweighed by the risk factors associated with contracting COVID-19." *Id.* at *3.

Mr. Hubbard's bases for refusing the vaccine—the lack of information provided by FCI Beckley and his fear of unmonitored anaphylaxis—are not reasonable bases to support his claim of extraordinary and compelling circumstances. Mr. Hubbard maintains that FCI Beckley has not provided him with enough information on the vaccine, including the Emergency Use Authorization fact sheet, but he has not asked for information on the vaccine or the risks of adverse reactions or anaphylaxis. While Mr. Hubbard stated at the hearing that he discussed the vaccine with his mother, he did not expound on her counsel. Mr. Hubbard also knew that the vaccine was again available in April 2021 but failed to take any

---

[7] In support of his motion, Mr. Hubbard attaches two Marshall Project stories purporting to demonstrate the reasonability of his denial of vaccination. The first story reports that many incarcerated individuals distrust the prison medical system, and the second report discusses reasons why correctional officers decline the vaccine, which he contends are similar to his own refusal. (Def.'s Reply at 2-4; Ex. F, Def.'s Reply [Doc. # 180-1]; Attach. B, Def.'s Second Suppl. Mem. in Supp. Of his Mot. to Modify Sentence [Doc. #181-1].)

measures to see if FCI Beckley was providing any additional information or if he was eligible for the vaccine.

Mr. Hubbard's reliance on his fear of anaphylaxis for declining the vaccine is similarly unreasonable. The unquestionable health risk reduction benefits from vaccination vastly outweigh the remote risk[8] of a severe allergic reaction, particularly considering that Mr. Hubbard has no known allergies to the vaccine's components or prior history of vaccine reaction. Even accepting Mr. Hubbard's recollection that in January 2021 incarcerated individuals were not medically monitored immediately after vaccination, he has no personal knowledge of whether inmates were subsequently monitored after vaccination because he did not go to the health office in April when vaccinations were again offered. Importantly, Mr. Hubbard offers no evidence of any actual mismanagement of adverse reactions to the vaccine or untreated anaphylaxis at FCI Beckley. His subjective mistrust of FCI Beckley to treat post-vaccination anaphylactic reaction is too speculative to demonstrate that Mr. Hubbard's situation and medical conditions should be found to constitute extraordinary and compelling circumstances. *See Colon*, 2021 WL 1246187, at *3.

In determining whether there are extraordinary and compelling reasons for compassionate release, courts also consider the ability of an institution to manage the spread of the virus. *See United States v. Feliciano*, No. 3:18-cr-287 (SRU), 2020 WL 5594121, at *6 (D. Conn. Sept. 17, 2020) (collecting cases). The Court recognizes that vaccination does not eliminate the risk of contracting COVID-19 and that conditions in prisons can rapidly change. *See United States v. Suggs*, No. 3:99cr244 (JBA), 2021 WL 2661874 (D. Conn. June 28, 2021); *see also United States v. Haessly*, No. 3:16-cr-32(VAB), 2020 WL 5269793 (D. Conn. Sept. 4,

---

[8] Defendant has presented evidence that if severe allergic reactions are likely to occur, they occur on average 13 minutes after administration. (*See* Decl. of Dr. Jaimie Meyer [Doc. # 180-1] ¶ 16.) However, the same evidence describes that the frequency of such serious allergic reaction as "exceedingly rare." (*Id.* ¶ 15 (stating that for the Pfizer vaccine, there were only 11.1 cases per 1 million doses of an allergic reaction and "all were easily managed").)

2020) (recognizing that extraordinary and compelling circumstances may exist in a facility without active COVID-19 cases). When Mr. Hubbard submitted his motion, two inmates and six staff members were positive for the coronavirus. (Def.'s Mem. at 2.) Currently, there are no active infections among the incarcerated population and there is one infection among the staff members. *COVID-19*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus (last accessed Nov. 10, 2021). Of the 1,569 incarcerated persons at FCI Beckley, 1,127 are fully inoculated, *id.*, and 233 staff members are fully vaccinated. *FCI Beckley*, FED. BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/bec (last accessed Nov. 10, 2021). While the number of COVID-19 infections in a prison can quickly change, *see Haessly*, 2020 WL 5269793, it appears that as of now, FCI Beckley has been able to reasonably manage the spread of the virus at the facility. Further, vaccination of 71% of the inmate population has at least reduced Mr. Hubbard's likelihood of becoming infected, which Mr. Hubbard acknowledged during his hearing. *See United States v. Rao*, 3:12-cr-97 (SRU), 2021 WL 3742127, at *7 (D. Conn. Aug. 23, 2021) (noting that a "substantial percentage of the inmate population at FCI Beckley . . . is fully vaccinated" while concluding that extraordinary and compelling circumstances did not exist).

On balance, Mr. Hubbard has failed to demonstrate extraordinary and compelling circumstances warranting sentence reduction. His contention that his obesity and hypertension are extraordinary and compelling does not address the reality that his risk would be substantially reduced if he were vaccinated. Moreover, Mr. Hubbard's bases for declining the vaccine are not justifiable because he failed to seek out any information from FCI Beckley, failed to take affirmative steps to see if he was eligible for the vaccine, and offers no record of untreated anaphylaxis at FCI Beckley among the 71% of the incarcerated population which has been fully vaccinated (1,127 individuals).

### C. Section 3553(a) Factors

Even if Mr. Hubbard established extraordinary and compelling circumstances, the 18 U.S.C. § 3553(a) factors do not weigh in support of granting Mr. Hubbard's motion for compassionate release. Under § 3553(a), the Court seeks to impose a sentence that is "sufficient, but not greater than necessary" to:

> reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . to afford adequate deterrence to criminal conduct . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* The Court must also determine if Defendant is a "danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13; *see* 18 U.S.C. § 3582(c)(1)(A).

Mr. Hubbard has failed to show why his release to home confinement would not present a risk to the public upon release, particularly considering his ten convictions, four probation violations, and his threatening emails sent after this motion for sentence modification was filed. (Ex. A, Sentencing Tr., Def.'s Mem. [Doc. # 171-1] at 33; Gov't's Suppl. Resp. at 2.) Mr. Hubbard seeks to be resentenced to home confinement in Stamford, Connecticut, where he will seek employment, serve his community, and hopes to join the District's Support Court. (Ex. E, Plan for Reentry, Def.'s Mem. [Doc. # 171-1] at 51-53.) Stamford was the site of his prior criminal activity. (Gov't's Resp. at 4-5, 14-15.) Mr. Hubbard's family is prepared to support Mr. Hubbard upon his release, (*see* Ex. A-B, Def. Hubbard's Suppl. Mem. in Support of his Mot. to Modify Sentence [Doc. # 179-1] at 2-4), but their support and Mr. Hubbard's reentry plan do not outweigh the Court's concern about returning him back to the site of his past criminal activity and cohorts in light of his criminal history and recent conduct. *See United States v. Torres*, No. 3:16-cr-00114(VAB), 2021 WL 837436, at *8 (D. Conn. Mar. 5, 2021) (concluding that the § 3553(a) weighed against the defendant's release considering his lengthy criminal history and his proposal to return to the

10

site of his criminal activity); *United States v. Gamble*, 3:18-cr-0022-4(VLB), 2020 WL 1955338, at *6 (D. Conn. Apr. 23, 2020) ("Defendant is ill suited for home confinement because of his lengthy criminal history and no conditions could adequately protect the public.").

When Mr. Hubbard moved for compassionate release, he had no record of disciplinary infractions. He has since been disciplined for threatening bodily harm and mail abuse, both of which stem from his expulsion from the Residential Drug Abuse Program ("RDAP"). (Ex. 2 [Doc. # 187-1] at 1; Ex. 3 [Doc. # 187-3] at 1.) He stated that he takes full responsibility for his actions and should not be regarded as a danger to others because he was never placed in segregation or transferred to another institution. Even so, Mr. Hubbard's failure to complete RDAP and the conduct underlying his disciplinary sanctions further underscore the Court's apprehension about releasing him back to the community at this time, regardless of the BOP sanctions imposed.[9]

Accordingly, having considered the factors set forth in 18 U.S.C. § 3553(a), the Court concludes Mr. Hubbard has failed to meet his burden of proving entitlement to sentence modification.

---

[9] Mr. Hubbard also argued in his motion hearing that the Disciplinary Hearing Officer hearing violated his due process rights because the Government did not adhere to the doctrine of completeness when it introduced emails out of context and the Bureau of Prisons failed to give him a copy of his disciplinary history report, stymieing his appeal. These issues, however, do not impact his motion for a sentence reduction.

11

## III. Conclusion

For the foregoing reasons, Defendant's Motion for Compassionate Release [Doc. # 170] is DENIED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of November 2021.